**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


**CONMACO/RECTOR L.P.**                                    **CIVIL ACTION**


**VERSUS**                                                 **NO: 12–2337**


**L&A CONTRACTING COMPANY**                                **SECTION: "H"(4)**


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is a civil action arising out of an equipment lease between Conmaco/Rector, L.P. ("Conmaco") and L&A Contracting Company ("L&A"). Conmaco seeks money damages for amounts allegedly due and owing under the lease. Whether Conmaco can prevail turns largely on the proper commencement date for rental payments. L&A denies breaching the equipment lease and asserts a counterclaim for breach of the warranty against vices or defects. The counterclaim requires the Court to determine whether Conmaco knew or should have known the equipment leased was defective.

This matter was tried before the undersigned without a jury.  Having considered the evidence admitted at trial and the arguments of counsel, the Court announces its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.  To the extent a finding of fact constitutes a conclusion of law,  the Court adopts it as such.  To the extent a conclusion of law constitutes a finding of fact, the Court adopts it as such.

**FINDINGS OF FACT**

There are two primary issues in this case.  First, the Court must determine the commencement date of the lease.  Conmaco contends that date is November 1, 2011; L&A argues the date was December 20, 2011.  Second, the Court must determine whether L&A has waived its right to recover damages for breach of the warranty against vices or defects.  The issue presented is whether Conmaco knew or should have known the equipment leased was defective.  For purposes of clarity, the Court separates its findings of fact with respect to each issue.

**I. Commencement Date of the Lease**

1.      The Plaintiff and Counterclaim Defendant in this matter is Conmaco—a Delaware limited partnership that sells, services, and rents construction equipment.  This equipment includes winches and pumps for offshore operations, pile-driving equipment, and lifting equipment.

2.      The Defendant and Counterclaim Plaintiff is L&A.  L&A is a Mississippi corporation that performs contracting work in the Gulf region.

3.      Conmaco and L&A have maintained a business relationship for approximately twenty-five years.  Most of this business involves the sale and rental of pile-driving equipement.

4.      Some time in early 2011, L&A won a contract to perform flood control work on the Houma Navigation Canal (the "HNC Project").  The HNC Project required L&A to drive several piles approximately 90 inches in diameter into the Canal.

5.      Michael Favoloro ("Favoloro") is the general manager of Conmaco.  When Favoloro learned in March 2011 that L&A had been awarded the HNC Project, he immediately contacted his long-time business associate Charlie Sutherland ("Sutherland"), who serves as L&A's vice president.  On behalf of Conmaco, Favoloro offered to provide a large pile-driving hammer manufactured by a Korean company, Shinsigae Powerquip, Inc. ("BRUCE"), to assist L&A with the HNC Project.

6.      On March 18, 2011, Conmaco sent a proposal to L&A for the sale and lease of a BRUCE Model SGH-3015 Acting Hydraulic Impact Pile Hammer (the "SGH-3015") and certain component parts, which L&A rejected.  Conmaco submitted a second proposal dated March 29, 2011 (the "Second Proposal").

7.      Walt Robbins ("Robbins")—an estimator for L&A—emailed Favoloro on April 28, 2011 and requested Conmaco to "[b]egin acquiring [the SGH 3015].  We will be needing it onsite by the first of November of this year."  Robbins works under Cory Bielstein ("Bielstein") and does not have authority to contract on behalf of L&A.

8.     On May 2, 2011, Favaloro emailed Bielstein and Robbins, and carbon copied Sutherland. Favoloro stated that the SGH-0315 offered in the Second Proposal was committed to another project "and may not be available for [L&A's] November 1, 2011 required delivery date." Favoloro further advised that Conmaco was considering purchasing a new SGH-3015 from BRUCE in order to accommodate L&A's request for a November 1, 2011 delivery.

9.     On May 23, 2011, Favaloro emailed Sutherland directly, stating that Conmaco had reached a deal with BRUCE but that it desired to revise the terms of the Second Proposal.  At Sutherland's request, Conmaco sent a revised lease (the "Lease"), which the parties executed on or about May 23, 2011.

10.    The equipment leased was an SGH-3015 together with its component parts (the "Hammer"), a pile skirt, a drive cap, and cap housing.  The rental rate was $130,000.00 per month with a three-month minimum.  The rent for the first three months was due in advance: the first month was due when the Lease was signed; the second month was due upon shipment from BRUCE's factory in Korea; and the third month was due upon delivery of the Hammer to L&A's jobsite in Houma, Louisiana.  Subsequent months would be due "net 30 days from invoice date" and "payable . . . immediately upon [L&A's] receipt of an invoice from [Conmaco]."  The Lease further provided that L&A was responsible for the freight charges from BRUCE's factory to L&A's jobsite ("Freight Out"), and for freight charges from L&A's jobsite to Conmaco's yard in Belle Chasse, Louisiana ("Freight In").

11.     The Lease also contains the following provisions:

>    2.     THE RENTAL TERMS HEREUNDER SHALL COMMENCE ON THE EARLIER OF THE DAY THAT THE EQUIPMENT LEAVES LESSOR'S YARD FOR DELIVERY TO LESSEE OR THE RENTAL COMMENCEMENT DATE SET FORTH IN THE SPECIAL TERMS SECTION, ABOVE, AND SHALL TERMINATE ON THE LATER OF THE EXPIRATION OF THE TERM SET FORTH IN THE SPECIAL TERMS SECTION, ABOVE, OR ON THE DAY THAT THE EQUIPMENT IS RETURNED TO LESSOR'S YARD.  Lessee agrees that it shall inspect the Equipment immediately upon its arrival at the jobsite and within 72 hours thereafter, deliver to Lessor written notice rejecting the Equipment due to a specific condition or defect which renders the same inoperable or defective in whole or in part.  Lessee's failure to deliver such notice to Lessor within such period shall constitute an acknowledgment by the Lessee that the Equipment has been delivered and installed by the Lessor as required by this Lease, that the Equipment is in good working order and is acceptable in all respects for Lessee's purposes and that Lessee has accepted the Equipment 'AS IS, WHERE-IS" condition.  If the Lessee gives Lessor written notice of rejection, such notice shall specify, in detail, any defect or other objection to the Equipment.   UNLESS OTHERWISE STATED HEREIN, LESSEE AGREES TO PAY THE ENTIRE COST OF TRUCKING AND ANY OTHER FREIGHT CHARGES TO AND FROM LESSOR'S YARD AND THE JOBSITE

>    3.     LESSOR HAS MADE NO REPRESENTATION OF WARRANTY OF ANY KIND, NATURE, OR DESCRIPTION, EXPRESS OR IMPLIED, WITH RESPECT TO THE EQUIPMENT, INCLUDING, WITHOUT LIMITATION, THE CONDITION OF THE EQUIPMENT, ITS MERCHANTIBILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE; EXCEPT THAT LESSOR WARRANTS THAT IT WILL HAVE TITLE TO THE EQUIPMENT AT THE TIME OF DELIVERY THEREOF. AS TO LESSOR, THEREFORE, LESSEE EXPRESSLY AGREES THAT IT LEASES THE EQUIPMENT "AS IS." LESSOR

SHALL NOT BE LIABLE FOR ANY DAMAGES BY REASON OF FAILURE OF THE EQUIPMENT TO OPERATE OR FAULTY OPERATION OF THE EQUIPMENT OR SYSTEM. LESSOR SHALL NOT BE HELD RESPONSIBLE FOR ANY DIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES RESULTING FROM THE INSTALLATION, OPERATION, OR USE OF THE EQUIPMENT. NO DEFECT OR UNFITNESS OF THE EQUIPMENT SHALL RELIEVE LESSEE OF THE OBLIGATION TO PAY RENT OR OTHERWISE PERFORM UNDER THE LEASE. **LESSEE ACKNOWLEDGES THAT THE FOREGOING LIMITATIONS OF WARRANTY HAVE BEEN BROUGHT TO ITS ATTENTION BY LESSOR AND THAT IT HAS READ AND UNDERSTANDS THE SAME.**

4.  THE VENDOR, METHOD OF SHIPMENT, MAKE, MODEL, SPECIFICATIONS, PERFORMANCE, AND ALL OTHER MATTERS RELATING TO THE ORDERING, DELIVERY, OPERATION, AND PERFORMANCE OF THE EQUIPMENT HAVE BEEN SELECTED AND DETERMINED BY LESSEE. LESSOR SHALL NOT BE LIABLE FOR LOSS OR DAMAGE OCCASIONED BY ANY CAUSE, CIRCUMSTANCE, OR EVENT OF WHATSOEVER NATURE, INCLUDING BUT NOT LIMITED TO FAILURE OF OR DELAY IN DELIVERY, DELIVERY TO THE WRONG PLACE, DELIVERY OF IMPROPER EQUIPMENT OR PROPERTY OTHER THAN THE EQUIPMENT, DAMAGE TO THE EQUIPMENT, GOVERNMENTAL REGULATION, STRIKES, STORMS, WAR EMERGENCIES, LABOR TROUBLES, BELATED RECEIPT OF MATERIALS, FIRES, FLOODS, WATER, ACTS OF GOD OR OTHER CIRCUMSTANCES OF LIKE OR UNLIKE NATURE.

12.  The "Special Terms Section" referenced in paragraph 2 of the Lease provides in pertinent part as follows: "Rental Commencement Date: Approximately November, 2011 (Exact date TBD). "

13.  The Lease is signed by Favoloro and Sutherland, and contains the latter's initials on each

6

page.

14.  On May 24, 2011, Conmaco issued invoice no. 13208 for the first month's rent, which L&A paid in full the next day.

15.  On September 15, 2011, the Hammer shipped from BRUCE's factory.  Accordingly, Conmaco issued invoice no. 13591 for the second month's rent, which L&A paid in full.[1]

16.  On or about September 28, 2011, Favorolo received a telephone call from L&A's project manager, Lynn Cox ("Cox").  Cox informed Favoloro that L&A would be unable to secure the derrick crane required to operate the Hammer until early January.  Thus, L&A would not need the Hammer until that time.

17.  On September 28, 2011, Favoloro emailed the president of Conmaco, Ralph Ross ("Ross"), and the branch manager for Conmaco's east coast division, Butch Allen ("Allen").  Favoloro explained that L&A did not need the Hammer until January.  In light of this delay, Favoloro queried whether the Hammer should still be delivered to L&A's jobsite or instead rerouted to Conmaco's yard.

18.  On the morning of September 29, 2011, Favorolo sent an email to Sutherland on which Ross was carbon copied.  Favoloro explained that Conmaco preferred to have the Hammer delivered to its yard until L&A was ready for delivery.  The email then provided as follows:

--------

[1] The record is unclear as to when L&A paid this invoice but it undisputed that the invoice was paid timely.

It is important, however, that we agree that this does not affect the terms of the Lease Agreement, as follows:
- The transportation costs of approximately $50,000 will still be due and payable 10 days from invoice date.
- The rental commencement date will remain as November 1st.
- The third month rent is due upon delivery to Conmaco's facility.

It should be further understood that the costs to transport the hammer package from Belle Chasse, LA to Dulac, LA [L&A's jobsite] will be at L&A's expense.

The email requested Sutherland respond as soon as possible. Favoloro testified at trial that the purpose of this email was to confirm Sutherland understood "that even though the hammer was not being delivered to the job site on November 1st as originally requested . . . the rental commencement date would still begin on November 1st."

19.     Sutherland did not respond to the email. In fact, Sutherland testified at trial that he could neither confirm nor deny that he received the email. This convenient lapse of memory undermines Sutherland's credibility as a witness.

20.     Favoloro telephoned Sutherland on September 29, 2011 and inquired whether he had received the email and reviewed it, to which Sutherland responded affirmatively. Favoloro then asked, "What do you think about it?" Sutherland responded, "Well, I guess it is what it is." Sutherland did not dispute any of the terms in the email, including the November 1st rental commencement date.

8

21.     The parties subsequently conformed their conduct to the content of Favoloro's September

        29, 2011 email.  On October 4, 2011, Conmaco issued invoice no. 13664 for $50,700, which

        covered freight charges from BRUCE's factory to Conmaco's yard.  L&A paid the invoice on

        October 13, 2011. On October 21, 2011, the Hammer was delivered to Conmaco's yard in

        Belle Chasse.  Accordingly, Conmaco issued invoice no. 13720 for the third month's rent,

        which Conmaco paid on November 8, 2011.  Under "Revised Terms," the invoice stated

        "Rental Period: 10/21/11 to 2/01/12."  Sutherland initialed the invoice next to the amount

        due.  On December 20, 2011, and at the request of L&A, Conmaco shipped the Hammer to

        L&A's jobsite.  Three days later, Conmaco issued invoice no. 13888 for $3,794.41 to cover

        freight charges, which Conmaco paid on February 6, 2012.

22.     During the week of January 2, 2012, L&A successfully drove a number of test piles with the

        Hammer.

23.     On January 9, 2012, L&A advised Conmaco that it discovered a casting problem with the

        strike plate in the Hammer.

24.     Conmaco arranged for BRUCE to cast a new strike plate.  The Hammer was inoperable from

        January 9, 2012 to February 28, 2012—the date it was returned to L&A in working

        condition.

25.     The Hammer remained at L&A's jobsite until April 25, 2012, after which it was returned to

        Conmaco.

9

26.     Following receipt of the Hammer, Conmaco issued three invoices, none of which L&A has
        paid.  On April 27, 2012, Conmaco issued invoice no. 14265 for $6,113.60, which covered
        (1) freight charges from L&A's jobsite to Conmaco's yard, and (2) disassembly charges.
        Conmaco does not dispute the freight charge but contends it is not responsible for
        disassembly charges.  On May 3, 2012, Conmaco issued invoice no. 14282 in the amount
        of $1,371.80 for damage to a shackle bracket on the Hammer.

27.     Conmaco also issued a second invoice on April 27, 2012—invoice no. 14261—which forms
        the crux of this lawsuit.  The first part of the invoice charges Conmaco $368,333.33 for a
        rental period of February 2, 2012 to April 26, 2012.  The second part, however, provides a
        "down time credit" of $195,000 for the period in which the Hammer was inoperable due
        to the casting defect.  The total amount charged in invoice no. 14261 is $173,333.33.

**II.  Whether Conmaco Knew or Should Have Known of the Defect in the Hammer**

28.     Conmaco is the exclusive distributor of BRUCE hammers in the United States and has sold
        and rented various models for the last eight years.

29.     Conmaco has only once experienced a problem with a BRUCE Hammer (the "Reid
        Disaster").  In 2008, Conmaco learned that an SGH-3015 it had rented—the same model
        Conmaco leased to L&A—had a casting defect in the ram.  BRUCE replaced the ram and the
        hammer was fully functional thereafter.  In fact, Conmaco rented the hammer again for a
        seven-month period and then sold it to another customer.

10

30.  Following the Reid Disaster in 2008, Conmaco took multiple steps to ensure future hammers it distributed from BRUCE would be fully functional.  Conmaco visited BRUCE's factory several times to meet with BRUCE's representatives.  BRUCE informed Conmaco that it had switched production of hammers to a larger, more well-established foundry. BRUCE also changed some of its testing and quality control procedures, which Conmaco reviewed and approved.  Finally, at some point subsequent to 2008, BRUCE became "ISO 900 Certified.  ISO is an international standards organization that issues a certificate when a manufacturer's quality control program is approved by a third-party organization.

31.  Conmaco purchased four hammers from BRUCE post-Reid Disaster.  Three of those hammers did not have any manufacturing defects.  The fourth is the Hammer at issue in this case.

32.  On July 8, 2011, Allen—who testified that he is "as familiar with the BRUCE Hammers as anyone"—sent an email to James Yoo ("Yoo"), a BRUCE representative, on which Ross was carbon copied.  The purpose of the email was to ask questions about and provide specifications for the SGH-0315 that Conmaco would lease to L&A.  Allen made several inquiries, including whether the drive cap (also known as the strike plate) could handle the stresses associated with L&A's job.  Yoo responded approximately twenty-four hours later and assured Allen the drive cap would be sufficient.

33.  Robert Harrold ("Harrold") has worked for Conmaco as a project manager for eighteen

years.  His job duties include quality assurance and inspection of Conmaco's equipment.

Harrold personally inspected each component part of the Hammer—including the strike

plate—before shipment to L&A.  Harrold did not observe any visual defects but conceded

on cross-examination that a visual inspection would not reveal internal casting defects.

Such defects are best discovered using x-ray or ultrasonic testing.  Harrold could have

requested this information from BRUCE but chose not to do so.  On redirect, Harrold

explained it is not customary for distributors like Conmaco to perform or request the results

of ultrasonic testing of equipment.

34.    In addition to passing visual inspection, the Hammer also passed a "function test," which

involves turning the Hammer on and making sure all parts move together as designed.

35.    Despite the foregoing precautionary measures, L&A discovered a casting defect in the strike

plate of the Hammer approximately three weeks after delivery.

36.    Ross aptly compared the defect in the hammer involved in the Reid Disaster and the defect

discovered in L&A's Hammer: "similar problem, different component." The problems were

similar in that each involved a casting defect.  But whereas the casting defect in the Reid

Disaster hammer was discovered in the ram, the defect in L&A's hammer was discovered

in the strike plate.  The ram and strike plate are different components and perform

different functions.  The ram is pulled up and then released with force onto the strike place.

The strike plate is connected to or covers the pile.  Thus, in essence, the ram "strikes" the

strike plate, which in turn transfers force to the pile and drives it.

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, which confers on the federal district courts original jurisdiction when the parties are completely diverse, and the amount in controversy exceeds $75,000.  Venue is proper, because a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of Louisiana. *See* 28 U.S.C. § 1391(b)(2).

## I.  Proper Commencement Date of the Lease

1.      Conmaco contends the rental commencement date was November 1, 2011.  L&A disagrees, arguing instead that rental payments did not begin to accrue until December 20, 2011.  The starting point in any contractual dispute is the contract between the parties.

2.      In this diversity case, Louisiana substantive law applies, including its principles of contract interpretation. *Bayou Steel Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 642 F.3d 506, 509 (5th Cir. 2011).  "According to the Louisiana Civil Code, '[i]nterpretation of a contract is the determination of the common intent of the parties.'" *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007) (quoting La. Civ. Code art. 2045).  In probing this intent, a court looks first to the four corners of the contract.  *See Ortego v. State, Dept. of Transp. & Dev.*, 689 So. 2d 1358, 1363 (La. 1997).  "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  La. Civ. Code art. 2046.  Thus, parole or extrinsic evidence

14

generally may not be considered unless the contract is ambiguous on the issue of intent. *See Total E & P USA, Inc. v. Kerr–McGee Oil & Gas Corp.*, 719 F.3d 424, 435 (5th Cir. 2013). A contract is ambiguous where (1) it fails to address a particular issue, (2) the terms are susceptible to multiple meanings, (3) there is uncertainty or ambiguity as to its provisions, or (4) the intent of the parties cannot be ascertained from the language chosen. *See Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2002). A doubtful provision "must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. Civ. Code. art. 2053. If after examining parole evidence the contract is still ambiguous, the contract is construed against its drafter. *See Greenwood 950, LLC v. Chesapeake La., LP*, 683 F.3d 666, 669 (5th Cir. 2012). Whether a contract is ambiguous is a question of law. *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 590 (La. 2007).

3.    The threshold issue is whether the Lease is ambiguous as to the rental commencement date. Paragraph 2 of the general terms and conditions provides that "the rental terms hereunder shall commence on the earlier of the day that the [Hammer] leaves [Conmaco's] yard for delivery to [L&A] or the rental commencement date set forth in the Special Terms section." The Special Terms provide as follows: "Rental Commencement Date: Approximately November, 2011 (Exact date TBD)." Thus, the rental commencement date is the earlier of the date the Hammer leaves Conmaco's yard for delivery to L&A or

15

"Approximately November, 2011 (Exact date TBD)."  The Special Terms do not specify how the "exact date" is to be determined.

4.     Other provisions of the Lease also bear on the issue of ambiguity.  The Special Terms provide that L&A is responsible for freight charges from BRUCE's factory to L&A's jobsite. Because the Hammer was to be shipped by BRUCE (and not Comaco), the general lease terms with respect to the rental commencement date would never be activated.  Thus, the Lease suggests the parties intended the Special Terms to control.  Because the Special Terms only provide an approximate commencement date and do not specify how that date will be determined, the Court finds the contract ambiguous.  Accordingly, it is appropriate to consider extrinsic evidence in determining the rental commencement date.

5.     Of particular import in construing this ambiguous contract is the conduct of the parties before and after execution of the Lease.  *See* La. Civ. Code art. 2053.  This conduct strongly suggests the parties intended November 1, 2011 as the rental commencement date.

6.     In response to the Second Proposal, Robbins—an L&A representative—emailed Favoloro on April 28, 2011 and requested the Hammer be delivered to L&A's jobsite by November 1, 2011.  Favoloro responded to this email on May 2, 2011 and carbon copied Sutherland. The email twice referenced November 1, 2011 as the date on which the Hammer would be delivered.  Conmaco subsequently coordinated shipment to meet this deadline but was informed by Cox in late September that L&A did not need the hammer until January.  As a

16

result of his conversation with Cox, Favoloro emailed Sutherland on September 29, 2011 to confirm that November 1, 2011 would still be the rental commencement date.  Although Sutherland did not respond to the email directly, Conmaco acquiesced to and satisfied the other terms in the email by paying (1) the third month's rent upon delivery of the Hammer to Conmaco's yard, (2) freight costs from Conmaco's yard to L&A's jobsite, (3) and transportation costs ten days from invoice.  L&A's compliance with these terms and conditions of the email is strong evidence that November 1, 2011—the other term in the email—was the agreed-upon rental commencement date.  Favoloro followed up his September 29, 2011 email to Sutherland with a telephone call in which he inquired whether Sutherland agreed with the terms of the email.  Favoloro's uncontroverted testimony is that Sutherland responded: "I guess it is what it is."  This testimony is yet further evidence that L&A agreed to begin paying rent on November 1, 2011.

7.    Conmaco also points to L&A's payment of invoice no. 13720 for the third's month rent as evidence that L&A agreed to a November 1, 2011 rental commencement date.  Under "Revised Terms," the invoice states that the rental period is "10/21/11 to 02/01/12."  Ross testified at trial that the invoice provides October 21 as the rental commencement date to memorialize the day the Hammer was delivered to Conmaco's yard.  Thus, according to Ross, the rental commencement date was still November 1, 2011.  Indeed, Conmaco did not charge L&A for the prorated month of October.  Because the invoice was ultimately

17

paid, Conmaco argues L&A is deemed to have accepted the terms of the invoice— including the November 1, 2011 rental commencement date—under Louisiana's "account stated" rule. The Court disagrees.

8.    Under the "account stated" rule, a debtor is deemed to have accepted the correctness of an account rendered if he receives notice and fails to object within a reasonable time. *See Darby v. Lastrapes*, 28 La. Ann. 605, 606 (La. 1876). Conmaco cites a 1978 Louisiana appellate court case in support of its position. In *Peterson Sales Co. v. C–Moore Glass, Inc.*, the defendant authorized the plaintiff to perform repairs on a truck. 296 So. 2d 397, 398 (La. Ct. App. 2d Cir. 1974). The plaintiff repaired the truck and sent several invoices to the defendant, each of which the defendant received but did not pay. *Id.* at 398–99. The defendant did not, however, protest the invoices to the plaintiff. *Id.* at 399. The plaintiff filed suit to collect the open account, and the district court entered judgment in his favor. *Id.* at 397. The appellate court affirmed, holding that the defendant's failure to object to the invoices, coupled with his inability to prove the invoices were incorrect, were dispositive. *Id.* at 399–400.

9.    The "accounted stated" rule has been applied sparingly. *See generally Succession of Drake*, 359 So. 2d 249 (La. Ct. App. 2d Cir. 1978); *Barron Builders & Mgmt. Co. v. J & A Air Conditioning & Refrigeration, Inc.*, No. 96–2921, 1997 WL 685352 (E.D. La. Oct. 31, 1997); *Meg-A-Builders, LLC v. Maggio*, No. 2008 CA 0937, 2008 WL 5377614 (La. Ct. App. 1st Cir.

2008) (unpublished).  Thus, one could certainly question whether the rule has risen to the level of *jurisprudence constante*, thereby acquiring precedential value.  *See Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 128–29 (La. 2000) ("[I]t is only when courts consistently recognize a long-standing rule of law outside of legislative expression that the rule of law will become part of Louisiana's custom under Civil Code article 3 and be enforced as the law of the state.").  More importantly, however, the account stated rule is only applied to suits on open accounts.  Unlike the accounts in the cases cited *supra*, the debtor in this case (L&A) has actually paid invoice 13720.

10.   Although the invoice is not dispositive, it is probative of the parties' intent.  That invoice 13720 (which L&A paid in full) provides the rental period as "10/21/11" but only charges rent as of November 1, 2011 is further evidence the parties intended a rental commencement date of November 1.

11.   The Court also looks to the equities in interpreting the Lease.  *See* La. Civ. Code art. 2053. "Equity . . . is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another." La. Civ. Code art. 2055.  It is uncontroverted that the parties initially intended the Hammer to be delivered to L&A's jobsite on November 1, 2011.  It is also uncontroverted that the Hammer was not delivered to L&A until December 20, 2011 due to a delay in L&A's construction schedule.  To the extent the delay caused any losses, those losses should be

19

borne by L&A—the party responsible for the delay.

12.   The Court's conclusion that November 1, 2011 is the rental commencement date is underscored by the dearth of evidence presented at trial in support of L&A's position. Both Sutherland and Cox testified they believed rental payments would not begin to accrue until the Hammer was delivered to L&A's jobsite. But there is reason to doubt the persuasive value of both witnesses' testimony.

13.   The Court finds Sutherland's credibility as a witness questionable. Sutherland conveniently does not remember whether he received Favoloro's September 29, 2011 email. This "maybe I did, maybe I didn't" explanation is highly suspect. Moreover, no evidence was presented at trial to controvert Favoloro's recollection of a telephone conversation in which Sutherland confirmed he received the email and assented to its terms. In fact, and perhaps most tellingly, L&A's counsel did not attempt to elicit *any* testimony about the conversation.

14.   Cox testified that he spoke with Favoloro on ten to fifteen separate occasions before the Hammer was delivered to L&A and that Favoloro never stated the rental commencement date was November 1, 2011. But Cox conceded on cross-examination that he had "nothing to do with the negotiation of Lease terms" and that he had "nothing to do with when the Lease was supposed to commence." According to Cox, Favoloro dealt "exclusively" with Sutherland during negotiation of the Lease. Thus, there was little reason for Favoloro to

discuss the rental commencement date with Cox.

15.    L&A focused both at trial and in post-trial briefing on the fact that Conmaco did not issue

monthly invoices for February, March, and April.  Instead, Conmaco billed for those months

in one lump sum when the Hammer was delivered back to Conmaco.  According to L&A,

Conmaco's failure to provide monthly invoices "points strongly towards the idea that

Conmaco itself did not think it was due any extra rent."  The Court disagrees.

16.    The Lease does not require monthly billing.  Although rent is due "net 30 days from invoice

date," the Lease does not provide a deadline by which Conmaco must issue an invoice.  The

Lease simply provides that rent is due "immediately upon [L&A's] receipt of an invoice from

[Conmaco]."  This open-ended provision allows Conmaco to bill at its leisure.  Moreover,

Ross testified that it is "not uncommon" for L&A to wait until a rental returns before issuing

an invoice for previous months.

17.    L&A also notes Robbins did not have contractual authority to bind L&A and that therefore

his actions on behalf of L&A—namely, sending an email in which he requested the Hammer

be delivered on November 1, 2011—should be disregarded.  L&A cites no legal authority

in support of this position.  To the extent L&A argues Robbins acted beyond the scope of

his mandate, L&A subsequently ratified his conduct and is therefore estopped from making

this argument. *See Florida v. Stokes*, 944 So. 2d 598, 603 (La. Ct. App. 1st Cir. 2006) ("In the

law of agency, ratification is the adoption by one person of an act done on his behalf by

another without authority."); *N. Am. Specialty Ins. Co. v. Employers Reinsurance Corp.*, 857

So. 2d 606, 610 (La. Ct. App. 1st Cir. 2005) ("It is well settled that ratification amounts to a

substitute for prior authority.").

18.    Finally, L&A highlights the fact that Conmaco never received anything in writing confirming

a November 1, 2011 rental commencement date.  While it certainly would have been

preferable to receive written confirmation, the Court does not find this fact dispositive in

light of the other evidence presented at trial.

19.    The rental commencement date in the Lease was November 1, 2011.

**II.  Whether Conmaco Knew or Should Have Known of the Defect in the Hammer**

20.    The warranty against vices or defects arises by operation of law in every contract of lease.

*Ford New Holland Credit Co. v. McManus*, 833 So. 2d 1130, 1133 (La. Ct. App. 2d Cir. 2002).

Under article 2696, the lessor warrants the thing leased "is suitable for the purpose for

which it was leased and that it is free of vices or defects that prevent its use for that

purpose."  La. Civ. Code art. 2696.  The warranty can be waived but only by clear and

unambiguous language brought to the attention of the lessee.  *Id.*  Even if these

requirements are met, a waiver is unenforceable "to the extent it pertains to vices or

defects of which the lessee did not know and the lessor knew or should have known."  La.

Civ. Code. art. 2699(1).

21.    The Court has already held that the Lease contains a clear, unambiguous waiver of which

22

L&A was made sufficiently aware.  *See Conmaco/Rector L.P. v. L & A Contracting Co.*, No.

12–1337, 2013 WL 5881576, at *5 (E.D. La. Oct. 30, 2013).  Furthermore, the parties do not

dispute that L&A was unaware of the casting defect in the Hammer.  *See id.*  The issue for

trial was whether Conmaco knew or should have known of the defect in the Hammer.

Conmaco bears the burden of proof on this issue.[2]

22.     The evidence presented at trial establishes that Conmaco did not know nor should it have

known of the defect in the Hammer.  Just like the hammer in the Reid Disaster, the

Hammer in this case was a model SGH-3015 that suffered from a casting defect.  Crucially,

however, the ram was defective in the former whereas the defective part in the latter was

the strike plate.  Moreover, the Reid Disaster happened approximately three years prior to

the incident in this case.  Since that time, Conmaco and BRUCE have undertaken multiple

steps to forestall another casting failure.  For example, Conmaco has made multiple site

visits to BRUCE's factory to meet with BRUCE representatives.  For its part, BRUCE has

switched to a larger foundry, revamped its quality assurance program, and become ISO 900

---

[2] Louisiana courts have not yet addressed which party bears the burden of establishing a waiver of warranty in the context of lease.  Louisiana courts have addressed this issue, however, with respect to a waiver of the warranty against redhibitory defects.  Those courts have uniformly held that the seller bears the burden of proof.  *See, e.g.*, *Wilks v. Ramsey Author Brokers, Inc.*, 132 So. 3d 1009, 1014 (La. Ct. App. 2d Cir. 2014); *Boos v. Benson Jeep-Eagle Co., Inc.*, 717 So. 2d 661, 664 (La. Ct. App. 4th Cir. 1998); *Monk v. Oakdale Motors Inc.*, 544 So. 2d 98, 100 (La. Ct. App. 2d Cir. 1989).  These cases stand for the principle that the party invoking a warranty bears the proof of proving its enforceability.  The Court finds this principle equally applicable to a waiver under article 2699 and therefore holds that the lessor bears the burden of proof.

certified.

23.    Conmaco also undertook specific quality control steps with respect to the Hammer at issue in this case.  Prior to acquiring the Hammer, Allen inquired of Yoo whether the strike plate could withstand the stresses of driving 90-inch piles.  Yoo assured him the Hammer was reasonably fit for this use.  Moreover, Conmaco performed a visual inspection test and a function test, both of which the Hammer passed.

24.    The Court's conclusion is further supported by the fact that L&A performed its own visual inspection and did not discover any defect.  Indeed, Sutherland conceded at trial that it was L&A's obligation under the Lease to inspect the Hammer and advise Conmaco of any defects.

25.    Finally, it is important to note that the defect was not discovered until approximately three weeks after the Hammer left Conmaco's possession and only after two test piles had been successfully driven.  A distributor such as Conmaco cannot reasonably be expected to know of such latent defects, especially where the distributor performs its only own quality control tests and reasonably relies on representations from an internationally-known manufacturer.

26.    Conmaco did not know nor should it have known of the defect in the Hammer.  Accordingly, the waiver of the warranty against vices or defects is enforceable and L&A's counterclaim is dismissed.

### III.    Damages

27.    Having established the rental commencement date and dismissed L&A's counterclaim, the

Court must now calculate to the damages to which Conmaco is entitled.  The rental period

under the Lease ran from November 1, 2011 until the Hammer was returned to Conmaco's

yard on April 26, 2012.  L&A pre-paid for the months of November, December, and January.

Thus, it technically still owes rent for February, March, and twenty-six days of April,[3] which

Conmaco has calculated as $368,333.30.  But this amount is not yet payable.

28.    The lease is clear that rent for subsequent months would be due "net 30 days from invoice

date" and "payable . . . immediately upon [L&A's] receipt of an invoice from [Conmaco]."

Under the plain words of the contract, L&A is not responsible for rental payments unless

it receives an invoice.  L&A *has not* received a separate invoice for $368,333.30.  Thus, there

is simply no basis under the Lease for recovery of $368,333.33.

29.    L&A did, however, receive invoice no. 14261 for $173.333.33.  Because L&A did not pay this

invoice within 30 days, the amount charged therein is due and owing.

30.    Even it had received a separate invoice for $368,333.33, L&A contends the "down time

credit" of $195,000 that Conmaco offered in invoice no. 14261 is binding on the parties.

Thus, L&A appears to contend that Conmaco would only be entitled to recover $368,333.30

---

[3] The Lease provides for prorated payments if the termination date does not fall on the last day of the month.

less $195,000, or $173,333.30.[4]  Once again, L&A offers no legal theory in support of its position.

31.     To the extent L&A argues the credit somehow modified the Lease, that argument fails.  The party asserting modification bears the burden of proving the parties mutually consented to the agreement as modified.  La. Civ. Code art. 1831; *Taita Chem. Co., LTD v. Westlake Styrene Corp.*, 246 F.3d 377, 387 (5th Cir. 2001).  L&A did not pay invoice no. 14621 nor did it otherwise manifest an intention to accept the credit.  Quite the contrary, L&A refused to pay the invoice and counterclaimed for moratory damages.  Accordingly, Conmaco's offer of a down-time credit is not binding on the parties.  *See Cajun Constructors, Inc. v. Fleming Constr. Co., Inc.*, 951 So. 2d 208,  214 (La. Ct. App. 1st Cir. 2006) ("[O]ne person may not change the terms [of a contract] unilaterally.").

32.     In sum, had Conmaco issued a separate invoice for $368,333.30 which L&A refused to pay, Conmaco would be entitled to judgment in this amount.  But Conmaco only invoiced for $173,333.30.

33.     Conmaco is entitled to recover $173,333.30 in rental payments.

34.     Conmaco also seeks money damages for L&A's failure to disassemble the Hammer, freight

---

[4] Unlike Conmaco, L&A chose not to provide a damages calculation in the event the Court finds the rental commencement date is November 1, 2011.  Thus, the Court can only speculate that L&A would not dispute the total due in invoice no. 14261.

costs, and damage to the shackle bracket of the Hammer.

35.    Invoice no. 14265 contains both the disassembly charge and the freight charge.  L&A only disputes the disassembly charge.  Both Favoloro and Ross conceded at trial the Lease does not explicitly allow Conmaco to charge for disassembly.  Nonetheless, they contend it was understood between the parties that such charges would be forthcoming.  Specifically, Ross testified that it is industry custom for an equipment lessor to charge the lessee for disassembly.

36.    When a contract is silent as to a particular situation, a court may consider "whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose."  La. Civ. Code art. 2054.  Conmaco essentially argues the Court should consider "usage," which the Code defines as "a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation." La. Civ. Code. art. 2055.  Whether usage has been established is a question of fact.  *Foods & Servs., Inc. v. SHRM Catering Servs., Inc.*, 486 So. 2d 290, 292 (La. Ct. App. 3d Cir. 1986).

37.    The threshold inquiry under article 2054 is whether the Lease is silent regarding disassembly charges.  Paragraph 5(b)(vii) is instructive:

> "UPON THE . . . TERMINATION OF THIS LEASE, [L&A] SHALL IMMEDIATELY RETURN THE EQUIPMENT TO [CONMACO] IN THE SAME OR BETTER CONDITION AS WHEN RECEIVED BY  [L&A],

27

> REASONABLE WEAR, TEAR AND DEPRECIATION RESULTING FROM
> PROPER USE THEREOF EXCEPTED, IT BEING UNDERSTOOD AND
> AGREED THAT [L&A] SHALL BE RESPONSIBLE FOR THE FULL COST OF
> ALL REPAIRS AND MAINTENANCE OF OR WITH RESPECT TO THE
> EQUIPMENT WHICH ARE CAUSED BY [L&A'S] USAGE, WHETHER ON
> ACCOUNT OF DAMAGE TO THE EQUIPMENT OR OTHERWISE.

This provision clearly sets forth L&A's delivery obligations.  That the provision does not expressly require L&A to disassemble the Hammer does not necessarily mean the Lease is silent  on the issue and that therefore resort to Article 2054 is warranted.  To the contrary, the imposition of certain obligations under Paragraph 5(b)(vii) implies the exclusion of  all other obligations, such as a requirement that L&A disassemble the Hammer before delivery to Conmaco.  *See* 17A John Bourdeaux et al., *Corpus Juris Secundum* § 415 (2014) ("Under the maxim '*expressio unius est exclusio alterius*,' the specification of items in a contact implies the exclusion of all not expressed.").  Moreover, as the drafter of this contract, Conmaco was in the best position to clearly express its intention to charge L&A for disassembly.  *See Mac Sales, Inc. v. E.I. du Pont de Nemours & Co.*, 24 F.3d 747, 751 (5th Cir. 1994).  Courts must take care when applying Article 2054 so as not to enlarge the scope of a contract beyond what the parties intended.

38.	Even assuming *arguendo* the Lease is silent on disassembly charges, Conmaco's claim still fails.  Conmaco offered only the self-serving, uncorroborated testimony of Ross as evidence

of industry practice.[5]  The Court finds such evidence insufficient as a matter of law to

establish usage.[6]

39.     L&A is only responsible for the freight charges portion of invoice no. 14265, which amounts

        to $1,744.00 (including sales tax).

40.     Invoice no. 14282 charges L&A $1,371.80 for damage to the shackle bracket of the

        Hammer.  The Louisiana Civil code provides that "[t]he lessee is liable for damage to thing

        [leased] caused by his fault."  La. Civ. Code art. 2687.  The Lease excepts from this general

        rule any "REASONABLE WEAR, TEAR, AND DEPRECIATION RESULTING FROM PROPER USE."

41.     It is undisputed that the shackle bracket was damaged at some point after the Hammer was

        delivered to L&A.  But Conmaco did not adduce *any* evidence at trial to suggest L&A caused

        the damage or that such damage resulted from anything other than normal wear-and-tear.

        In fact, Cox testified that L&A used the Hammer exactly as Conmaco instructed. Conmaco

        _____

        [5] Favoloro testified that disassembly charges were understood between the parties due to "repeat business," *i.e*, a prior course of dealing.  "But a 'course of dealing'—while possibly relevant to equitable considerations—does not provide a separate and independent basis for adding a contractual term when a contract is silent."  *Mac Sales*, 24 F.3d at 752 n.11.  Rather, the appropriate frame of reference for determining whether a practice is "regularly observed" is the industry or trade writ large.  *Id.* at 752.  Thus, the fact that Conmaco may have charged L&A for disassembly charges in the past has little bearing on whether such charges are customary in the heavy equipment industry as a whole.  *See id.*

        [6] *Cf. Foods & Servs.*, 486 So. 2d at 292 (finding uncorroborated testimony of party in industry insufficient to establish usage); *Baton Rouge Sash & Door Co., Inc. v. Saale*, 298 So. 2d 115, 118 (La. Ct. App. 1st Cir. 1974) (same).  Admittedly, these cases are distinguishable, because the testimony of the party attempting to establish custom was challenged by the opposing party.  In the instant case, L&A did not controvert Ross' assertion that disassembly charges are customary.

did not address this testimony in cross-examination or rebuttal.

42.  L&A is not responsible for invoice no. 14282.

43.  Conmaco also seeks attorney's fees.  In this diversity case, attorney's fees awards are governed by Louisiana law.  *See Wal-Mart Stores, Inc. v. Qore, Inc.*, 647 F.3d 237, 242 (5th Cir. 2011).  "Louisiana courts have long held that attorney fees are not allowed except where authorized by statute or contract."  *Stutts v. Melton*, 130 So. 3d 808, 814 (La. 2013).  Thus, in an action for breach of contract, the prevailing party may not recover attorney's fees "unless there is a specific provision therefor in the contract."  *Maloney v. Oak Builders*, 235 So. 2d 386, 390 (La. 1970).

44.  Paragraph 5(g) of the Lease clearly permits Conmaco to collect reasonable attorney's fees and costs incurred in enforcing the Lease.  Accordingly, Conmaco is entitled to attorney's fees from L&A.

45.  The remaining issue to be resolved is the applicable interest rate for outstanding invoices. The Lease does not address this issue.  Nonetheless, Conmaco argues it is entitled to an interest rate of 18% per annum.  In support of this argument, Conmaco references a printed statement at the bottom of each invoice, which provides for an interest rate of 18% per annum on all accounts past due.  Conmaco appears to argue that by paying these invoices, L&A agreed to the interest rate stated therein.  The Court disagrees.

46.  Louisiana recognizes two kinds of interest: conventional and legal. La. Rev. Stat. § 9:3500A.

Conventional interest must be fixed in writing and cannot exceed 12% per annum.  La. Rev. Stat. § 9:3500C(1).  It is well-established that a printed statement on the bottom of an invoice does not constitute a written agreement to pay interest.  *C & A Tractor Co. v. Branch*, 520 So. 2d 909, 911 (La. Ct. App. 3d Cir. 1987); *Succession of Drake*, 359 So. 2d at 251.  But even it did, the rate of 18% per annum is usurious and would therefore "result in the forfeiture of the entire interest so contracted."  La. Rev. Stat. § 9:3501.

47.   Where, as here, an interest rate is not fixed in writing, the creditor is only entitled to legal interest.  *Chittenden v. State Farm Mut. Auto. Ins. Co.*, 788 So. 3d 1140, 1151 (La. 2001); *see also* La. Civ. Code art. 2000.  The legal interest rate is fixed by statute.  *See* La. Rev. Stat. §§ 9:3500B(1); 13:4202B.

48.   Conmaco is entitled to legal interest on its judgment against L&A.

49.   Conmaco has proven the following damages by a preponderance of the evidence: $173,333.33 (outstanding rent) + $1,744 (freight charges).  Thus, Conmaco is entitled to judgment against L&A in the amount of $175,077.33, plus legal interest at the rate provided in Louisiana Revised Statute Section 9:3500B(1).  Post-judgment interest will accrue at the federal rate.  *See Enhanced La. Capital v. Brent Homes*, No. 12–2409, 2013 WL 5428687, at *4 (E.D. La. June 6, 2013).

50.   Conmaco is also entitled to attorney's fees.  Within twenty days of the entry of this Order, Conmaco shall file a motion before the magistrate judge to calculate the reasonable

attorney's fees and costs associated with bringing this action.

## CONCLUSION

The Lease between Conmaco and L&A is a classic example of "high risk, high reward." Although L&A received a favorable rate of rental on the Hammer, the Lease was fraught with peril. L&A agreed to begin paying rent on November 1, 2011, regardless of whether the Hammer was in its possession at the time. L&A also bargained away its right to recover damages for breach of the warranty against vices or defects. In short, L&A gambled and lost. But it could have been a lot worse. Conmaco could have recovered an extra $190,000 had L&A received a separate invoice. Fortunately for L&A, this invoice never issued.


New Orleans, Louisiana, this 5th day of May, 2014.

JANE TRICHE MILAZZO
**UNITED STATES DISTRICT JUDGE**